J-S39017-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| F.F. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| R.A.L. | : | |
| | : | |
| Appellant | : | No. 961 EDA 2019 |

Appeal from the Order Entered February 27, 2019
In the Court of Common Pleas of Monroe County
Civil Division at No: 139 DR 2015,
9167 CV 2017

BEFORE: GANTMAN, P.J.E., STABILE, J., and STEVENS*, P.J.E.

MEMORANDUM BY STABILE, J.:                    **FILED NOVEMBER 1, 2019**

R.A.L. ("Mother") appeals from the order entered February 27, 2019, which denied her request for relocation in this child custody dispute. The order awarded shared legal custody of L.F. ("Child") to Mother and F.F. ("Father"), and awarded primary physical custody to Mother if she returned to Monroe County from Montgomery County by September 1, 2019. If Mother did not return to Monroe County by September 1, 2019, the order awarded Father primary physical custody of Child. The order also denied Father's petition for contempt. After careful review, we affirm.

_____

* Former Justice specially assigned to the Superior Court.

The record reveals that Mother and Father met in approximately 2014[1] and began dating sometime thereafter. N.T., 10/26/18, at 53. From the start, drinking and domestic violence appear to have marred their relationship. *See id.* at 25-26. Mother obtained a Protection From Abuse order against Father by agreement and without admission in February 2015, which lasted only sixty days. N.T., 9/26/18, at 55-56; Defendant's Exhibit 9 (Final Protection From Abuse Order). Mother and Father rekindled their relationship, and Child was born in February 2016. The parties married in January 2017, but separated only four months later, in April 2017, after two further incidents of domestic violence.[2] *See* Plaintiff's Exhibit 8 (wedding photographs); N.T., 9/26/18, at 43-44, 58-59, 63. Mother then moved in with Child's maternal grandparents, while Father remained in the parties' apartment. N.T., 9/26/18, at 44; N.T., 10/26/18, at 90.

On December 8, 2017, Father filed a complaint in custody, in which he requested shared legal and physical custody of Child. However, the trial court dismissed Father's complaint without prejudice on December 13, 2017, due to his failure to include a blank criminal record/abuse history verification form. *See* Pa.R.C.P. 1915.3-2(a) ("The party must attach a blank verification form to a complaint, counterclaim or petition served upon the other party."). Father

---

[1] Father stated initially that he met Mother "six years ago." N.T., 10/26/18, at 25. He then stated that he had "known [Mother] for five years. No. Four and a half years." *Id.* at 53.

[2] Mother and Father were in the process of a divorce at the time of the custody proceedings. N.T., 9/26/18, at 47.

filed a second complaint on June 13, 2018, this time requesting sole legal and primary physical custody. The record indicates that he again failed to include a blank criminal record/abuse history verification form. While he attempted to supplement his complaint by filing a blank form on June 18, 2018, the court once again dismissed his complaint without prejudice on June 20, 2018. Father filed a third and final complaint on June 26, 2018, requesting sole legal and primary physical custody of Child, which complied with Rule 1915.3-2(a).

On July 11, 2018, Mother filed a notice of custody relocation, averring that she intended to leave Monroe County, where both she and Father resided, and move to Montgomery County to live with her boyfriend, B.V., and his two children. Mother indicated in her notice that she would like to retain primary physical custody of Child. Father filed a counter-affidavit opposing Mother's relocation on July 31, 2018.

On August 9, 2018, the trial court adopted the recommendation of the conciliator and entered an interim order of court. The order awarded shared legal custody and awarded Mother primary physical custody. The order further awarded Father partial physical custody each weekend. Specifically, on the first and third weekend of every month, the order awarded Father custody from Saturday at 9:00 a.m. until Sunday at 5:30 p.m. On the second and fourth weekend of every month, the order awarded Father custody from Friday at 6:00 p.m. until Sunday 6:00 p.m. Of particular relevance to this appeal, the order included a provision stating that neither party could relocate without complying with Section 5337 of the child custody statute, 23 Pa.C.S.A. § 5337.

Thereafter, on August 30, 2018, Father filed an emergency motion for custody hearing, averring that Mother intended to relocate to Montgomery County without the trial court's permission. The court entered an order that same day scheduling a hearing and prohibiting Mother from relocating prior to the hearing. Father filed a petition for contempt on September 5, 2018, in which he averred that Mother had relocated to Montgomery County during the previous weekend, in violation of the court's directive.

The trial court held a hearing on September 26, 2018, and October 26, 2018. In relevant part, Mother presented testimony attempting to extol the benefits of her move to Montgomery County. Mother's explanation of what motivated her move was somewhat conflicting. When asked why she decided to leave Monroe County, Mother first stated that she had been residing with Child's maternal grandparents, but that the "household . . . was becoming a bit toxic for my daughter," because she and Child's maternal grandmother had a poor relationship. N.T., 9/26/18, at 18-19. Mother also agreed with her counsel that she left because she believed she could improve her employment situation in Montgomery County. *Id.* at 22. However, she admitted that she moved to Montgomery County before she secured a job there. *Id.* at 23-25. In fact, Mother acknowledged that she did not accept a job in Montgomery County until the first day of the hearing, on September 26, 2018. *Id.* at 25. On cross-examination, she admitted that "the primary reason" she moved was that B.V. had secured a job in Montgomery County, "[a]mong many other reasons." *Id.* at 106.

- 4 -

Mother acknowledged that she moved to Montgomery County without the trial court's permission, but attempted to justify her actions by insisting that she signed the lease for her new home in Montgomery County on August 19, 2018, prior to the entry of the August 30, 2018 order that prohibited her from moving. *Id.* at 9-10. Mother further maintained that her move did not impair Father's ability to exercise his custodial rights to Child significantly. *Id.* at 44, 79. Mother's testimony focused on the fact that Father is an illegal immigrant from Ireland and lacks a driver's license. *Id.* at 45-47. She stated that Father receives transportation assistance from his family and that he is capable of meeting her halfway between Monroe County and Montgomery County in order to exchange custody of Child. *Id.* at 49-51.

Mother also endeavored during her testimony to characterize Father as violent and abusive. Most notably, Mother described incidents of domestic violence that occurred on February 9, 2015, and on April 6, 2017. She blamed Father for both of the incidents and described the injuries she sustained as a result. Regarding the incident on February 9, 2015, Mother reported that she suffered "[c]uts on my hands, [and] cuts on my arms." *Id.* at 60. Regarding the incident on April 6, 2017, Mother recounted that she left Father, but that "my mother forced me back into the house only for him to do it again." *Id.* at 58-59. She reported that she suffered "[c]uts and bruises, bruising from being thrown and pushed and whatnot. . . . I bled because I got cut with the glass door." *Id.* at 59.

- 5 -

However, Mother's admissions on cross-examination contradicted her version of events. With respect to the incident on February 9, 2015, Mother admitted that violence erupted between her and Father after she "broke into [Father's] apartment by kicking in the door[.]" *Id.* at 88. Father's counsel presented Mother with the police incident report from the night in question, which stated that Mother "'was clearly in the wrong here and none of this would have happened if she left [Father] alone.'" *Id.* at 89; *see also* Plaintiff's Exhibit 1 (Incident Report). Similarly, Mother admitted that the incident on April 6, 2017, occurred after she broke into the parties' shared apartment "by smashing a glass door with a hammer[.]" N.T., 9/26/18, at 91. She insisted that she was trying to retrieve her clothes and other belongings from the apartment, but was unable to do so because "the keys were removed from my presence." *Id.* Mother conceded that she later lied about the incident when she went to the hospital, saying that she cut her left arm on the glass "in self-defense, even though the actual reason . . . was smashing the window with a hammer[.]" *Id.* at 92-93. She also acknowledged that any injuries she suffered were "self-sustained."[3] *Id.* at 94.

---

[3] In addition, Mother described a third incident of domestic violence, which took place on April 27, 2017, and resulted in the parties' final separation. According to Mother, she picked up Father from work at 7:00 p.m. and discovered that he was drunk. N.T., 9/26/18, at 95. When Mother and Father arrived home, Mother attempted to put Child to bed. *Id.* However, Father "proceeded to get mad because the closet door was open in her bedroom." *Id.* Father then threw Mother into a table, Child's crib, a closet, and a wall. *Id.* Father presented a different version of these events, testifying that Child

Father also presented testimony, during which he challenged Mother's request to relocate by contending that she is hostile to his relationship with Child. For example, Father testified that he previously enjoyed daily FaceTime calls with Child, but that Mother ended the calls abruptly on the same weekend that she moved to Montgomery County. N.T., 10/26/18, at 44-45. Further, he reported that Mother offered to help him obtain a green card if he gave up custody of Child. *Id.* at 64. Father explained that he and Mother planned to use their marriage as a means for him to obtain a green card. *Id.* at 63-64. However, they "stopped the paperwork," because of their separation. *Id.* at 64, 91-92. After the separation, Father explained, Mother "said that she would give me a green card if I signed custody of my daughter over to her, full legal custody." *Id.* at 64.

Regarding his lack of transportation, Father testified that he works in New York City designing and building construction projects. *Id.* at 5, 11-14. Due to his lack of a driver's license, Father explained that a coworker drives him to New York City, or that he uses public transportation. *Id.* at 58, 81-82. He also stated that he receives transportation assistance from his aunt, who lives nearby in Monroe County. *Id.* at 5, 49. Father explained that he works

---

became excited and did not want to go to bed "because Daddy was home." N.T., 10/26/18, at 31. Father removed Child from her crib, after which Mother "started screaming at me saying . . . Put [Child] down. You don't know what you're doing. . . . And she went to kick me, but she kicked my daughter. And I pushed her into a table." *Id.* Following this incident, both parties received harassment charges. N.T., 9/26/18, at 96. Father pled guilty to his charge, while Mother's charge was withdrawn, apparently at Father's request. *Id.* at 95; N.T., 10/26/18, at 33-34.

for his uncle and stated that he would be able to work locally "from the shop" if he obtained primary physical custody of Child. ***Id.*** at 11-12.

Ultimately, Father contended that it would be in Child's best interest to remain in Monroe County because her extended family lives there, because it would allow her to maintain a social life as she grows older, and because it would be difficult for him to reach her in Montgomery County in the event of an emergency. ***Id.*** at 11. He explained:

> I think [Child] should be in Monroe County. Her family is here, her [maternal] grandfather, her [maternal] grandmother, my aunt, my uncle, me. Like I work in New York City, I commute to New York City every day and I come back every evening. When we split up, I was going to move to Jersey because it was a shorter commute, and I didn't. I chose to stay here and do the commute from here because my daughter was here.
>
> ***
>
> [Child's] family is all up here. Her [maternal] grandparents, her cousins, everybody is up here. Like if [Child] -- so [Child] is going to make friends and then friends are going to have parties and then parties are going to be on the weekends. And if that's -- if it stays the way it is and I get my daughter on the weekends, [Child] is not going to be having parties with her friends. She's going to be with me.
>
> [Child] is -- everyone is here. Everyone is in Monroe County. No one is moving. There is no need for her to move. If something happens to [Child], how do I get to Montgomery County? You know what I mean?

***Id.*** at 11, 48. Father reported that he plans to build a house for himself and Child in Monroe County on a lot that his aunt owns, which is adjacent to her home. ***Id.*** at 17.

Following the hearing, on February 27, 2019, the trial court entered an order denying Mother's request to relocate and Father's petition for contempt. The order awarded shared legal custody to both parties and awarded primary physical custody to Mother, provided that she returned to Monroe County by September 1, 2019. If Mother returned to Monroe County, the order directed that Father would exercise partial physical custody on the first, second, and fourth weekend of every month from Friday at 6:00 p.m. until Sunday at 6:00 p.m., and each Wednesday from 5:00 p.m. until 8:00 p.m. If Mother did not return to Monroe County, the order directed that Father would receive primary physical custody and that Mother would exercise partial physical custody on the first, second, and fourth weekend of every month from Friday at 6:00 p.m. until Sunday at 6:00 p.m.

In addition, the trial court issued an opinion setting forth its analysis of the Section 5328(a) custody best interest factors, enumerated at 23 Pa.C.S.A. § 5328(a),[4] and the Section 5337(h) custody relocation factors, enumerated at 23 Pa.C.S.A. § 5337(h). In analyzing the factors, the court found that both parties are capable of caring for Child. However, the court expressed concern that Mother relocated to Montgomery County in violation of its August 30, 2018, order and that the relocation would impair Father's custodial rights. The court observed that Child's entire family resides in Monroe County and that

---

[4] The trial court did not conduct a separate analysis of Section 5328(a)(2.1). The only evidence relevant to this factor was that an unfounded report of child abuse was filed against Mother in 2017. N.T., 9/26/18, at 57-58, 76-77.

she has no connection to Montgomery County. The court's analysis of Section 5337(h)(10) is illustrative of its reasoning:

> We recognize both Mother and Father are concerned with what is in the best interests of [Child]. In fact, many of the witnesses for the parties have indicated that each are good parents. We are nevertheless concerned that Mother violated the Court's Order by unilaterally moving to Montgomery County when she was aware that custody proceeding[s] were pending. In addition, she stopped daily Face[T]ime between [Child] and Father.
>
> We also consider the support system and family members who reside in Monroe County and that there is not such support in Montgomery County. Mother has the burden to establish that the relocation will best serve [Child's] interests; and we find that she has failed to establish this. In conducting our analysis based upon the above factors, we conclude that Mother's request to relocate should be denied. After careful consideration of the testimony and evidence in this matter, we believe that it is in [Child's] best interest to have the parties continue to share legal and physical custody of [Child].[5] Should Mother decide to remain in Montgomery County, we believe that the best interests of [Child] will be served by awarding Father primary physical custody.

Trial Court Opinion, 2/27/19, at 17.

Mother timely filed a notice of appeal on March 26, 2019, along with a concise statement of errors complained of on appeal.[6] She raises the following claims for our review:

---

[5] As noted above, despite its conclusion that Mother and Father should "share" physical custody of Child, the trial court's order contains two possible primary physical custody awards.

[6] This Court entered an order *per curiam* granting Mother's petition to stay the trial court's order pending disposition of this appeal on August 26, 2019.

1. Did the Trial Court err in determining that Mother's move significantly impairs Father's ability to exercise his custodial rights?

2. Did the Trial Court err when considering the best interest of the child by not giving the appropriate weight to Father's immigration status and inability to obtain a driver's license?

3. Did the Trial Court err in determining that Mother's move had altered the feasibility of preserving the relationship between Father and [C]hild?

4. Did the Trial Court err in determining that Mother failed to meet her burden to establish that the move will best serve the minor child's interests?

Mother's brief at 8-9 (suggested answers omitted).

Our standard of review in child custody cases is as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*V.B. v. J.E.B.*, 55 A.3d 1193, 1197 (Pa. Super. 2012) (citations omitted).

"When a trial court orders a form of custody, the best interest of the child is paramount." *S.W.D. v. S.A.R.*, 96 A.3d 396, 400 (Pa. Super. 2014) (citation omitted). The factors that trial courts must analyze when awarding custody are set forth at 23 Pa.C.S.A. § 5328(a):

**(a) Factors.--**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

In addition, the factors that trial courts must analyze when considering a request to relocate[7] are set forth at 23 Pa.C.S.A. § 5337(h):

**(h) Relocation factors.--**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

---

[7] Our child custody statute defines "relocation" as "[a] change in a residence of the child which significantly impairs the ability of a nonrelocating party to exercise custodial rights." 23 Pa.C.S.A. § 5322(a).

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S.A. § 5337(h).

In her first claim, Mother argues that her move to Montgomery County was not a "relocation" under our child custody statute because it did not impair Father's ability to exercise custodial rights significantly. Mother's brief at 16-18. Mother argues that she transports Child to custody exchanges in Monroe County and that her move has not prevented Father from exercising the same

custodial rights that he had before. *Id.* Further, Mother maintains that the trial court relied improperly on Father's lack of a driver's license when reaching its decision. *Id.* at 17-18. She stresses that Father commutes to New York City for work each day, which is seventy-eight miles from his home, but that he would need to travel only half of the seventy-mile distance to her home in order to reach her proposed custody exchange location. *Id.* at 17.

Our review of the record confirms that Mother's claim is meritless. At the time Mother moved to Montgomery County in September 2018, the August 9, 2018 order provided that Mother and Father "shall share transportation equally as they can agree."[8] Order and Recommendation, 8/9/18, at 7. In the event the parties were unable to agree, the order directed that it would "be the responsibility of the party who will be obtaining physical custody, or a designee, to pick up the child at the residence of the other party." *Id.* Thus, barring an agreement to the contrary, Mother's move imposed an obligation on Father to travel from Monroe County to Montgomery County in order to obtain custody of Child. Given the substantial distance involved, and Father's inability to transport himself to exchanges, it is apparent that this obligation impaired Father's ability to exercise custodial rights significantly.

---

[8] The August 30, 2018 order did not address transportation.

It appears from the record that Mother was traveling to Monroe County to facilitate custody exchanges by the time the hearing began on September 26, 2018.[9]  **See**, **e.g.**, N.T., 9/26/18, at 169-70 (the trial court instructing, "I've indicated to the lawyers that that transportation is going to be what you've been doing the last few weeks.  And that's going to require [Mother] to do the exchanges here in Monroe County.").  However, this fact does not change our analysis.  Mother requested during the hearing that Father share transportation duties with her equally and that custody exchanges take place "somewhere in the middle" between Monroe County and Montgomery County.  **Id.** at 51.  Therefore, even accepting for the sake of argument that Mother's move had not impaired Father's ability to exercise custodial rights thus far, she was requesting that the court impair Father's ability to exercise custodial rights going forward by imposing a significant transportation obligation on him in its forthcoming order.  Mother was still requesting a "relocation" as our child custody statute defines that term.

Finally, Mother's contentions regarding Father's commute to New York City are equally unavailing.  Mother is correct that Father travels to New York City for work despite lacking a driver's license.  However, Mother's argument ignores the methods that Father uses to make this commute possible.  Father

---

[9] On October 30, 2018, the trial court entered an interim order confirming this arrangement.  **See** Order, 10/30/18 ("Pending further Order of Court . . . [Mother] shall provide all transportation with the exchange of custody occur[r]ing in Monroe County unless the parties agree otherwise.").

explained that a coworker drives him to New York City and that he sometimes relies on public transportation. N.T., 10/26/18, at 58, 81-82. There is no indication in the record that Father would have the same opportunities for transportation to and from Mother's proposed exchange location.[10] Therefore, Mother's first claims does not entitle her to relief.

Mother's second claim is that the trial court erred by placing insufficient weight on Father's immigration status. Mother's brief at 18-21. She maintains that Father's status as an illegal immigrant "provides a poor example" for Child and "promotes illegal activity and in-action [*sic*] on life's problems" in that he has done nothing for six years to obtain legal status. *Id.* at 19-20. She notes that Father's status prevents him from obtaining financing in order to build a home as he testified he intended to do during the hearing. *Id.* at 20. As part of this claim, Mother also argues that she has been the primary caretaker for Child since her birth, and challenges the court's finding that her relocation was a violation of its August 30, 2018 order. *Id.* at 20-21. She argues that she signed the lease for her new residence in Montgomery County on August 19, 2018, "several weeks before the Honorable Trial Court issued its Order." *Id.* at 21.

_____

[10] We note that Father testified his aunt, T.H., would be willing to transport him to Mother's proposed custody exchange location. N.T., 10/26/18, at 82-83. Importantly, the fact that Father would be willing or able to overcome the impairment Mother created by relocating to Montgomery County, in order to exercise custody of Child, does not make that impairment any less significant.

We discern no error of law by the trial court. Child was less than three years old at the time of the hearing and it is unlikely she understands Father's immigration status. Even assuming that Child learns of Father's status as she grows older, it would be highly speculative to conclude that knowing Father is an illegal immigrant will encourage Child to engage in illegal conduct. Notably, the record belies Mother's claim that Father has taken no action to address his immigration status for six years. As explained above, Father testified that he was in the process of obtaining a green card after marrying Mother in 2017, but that the parties' separation halted his efforts. N.T., 10/26/18, at 64, 91-92. Mother admitted that she had refused to assist Father in obtaining a green card since their separation, and that she had been using his illegal status as leverage in their custody dispute. N.T., 9/26/18, at 47-48, 102. Specifically, she stated that she offered to help Father become a citizen if he "let me have primary custody[.]" *Id.* at 102.

While Mother also argues that the trial court should have placed more weight on her status as Child's primary caretaker, and that she did not violate the August 30, 2018 order because she signed her lease on August 19, 2018, she waived both of those claims by failing to include them in her statement of questions involved and concise statement. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) ("[I]ssues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived."). Even if not waived, Mother's claims would be meritless.

First, Mother's status as Child's primary caretaker is not entitled to any particular amount of weight under our law. Prior to the implementation of the current custody statute in 2011, our courts adhered to the so-called "primary caretaker doctrine." The doctrine instructed, "in cases involving an award of primary physical custody 'where two natural parents are both fit, and the child is of tender years, [that] the trial court must give positive consideration to the parent who has been the primary caretaker.'" *M.J.M. v. M.L.G.*, 63 A.3d 331, 337 (Pa. Super. 2013), *appeal denied*, 68 A.3d 909 (Pa. 2013) (quoting *Commonwealth ex rel. Jordan v. Jordan*, 448 A.2d 1113, 1115 (Pa. Super. 1982)) (emphasis omitted). However, courts are no longer obligated to give positive consideration to a parent's status as a primary caretaker. As we have explained:

> The language of this statute is clear. It explicitly provides that all relevant factors shall be considered by the trial court, and the only factors that should be given "weighted consideration" are factors that "affect the safety of the child[.]" [23 Pa.C.S.A. § 5328(a).] When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit. If the Pennsylvania Legislature intended for extra consideration be given to one parent because of his or her role as the primary caretaker, it would have included language to that effect. Stated another way, the absence of such language indicates that our Legislature has rejected the notion that in analyzing both parents, additional consideration should be given to one because he or she has been the primary caretaker.
>
> Furthermore, the consideration the primary caretaker doctrine sought to address (which parent spent more time providing day-to-day care for a young child) is addressed implicitly in the enumerated factors. *See*, *e.g.*, 23 Pa.C.S.A. §§ 5328(a)(3) ("The parental duties performed by each party on behalf of the

child."); (a)(4) ("The need for stability and continuity in the child's education, family life and community life.").  The considerations embraced by the primary caretaker doctrine have been woven into the statutory factors, such that they have become part and parcel of the mandatory inquiry.

\*\*\*

We hasten to add that this conclusion does not mean that a trial court cannot consider a parent's role as the primary caretaker when engaging in the statutorily-guided inquiry.  As discussed above, a trial court will necessarily consider a parent's status as a primary caretaker implicitly as it considers the section 5328(a) factors, and to the extent the trial court finds it necessary to explicitly consider one parent's role as the primary caretaker, it is free to do so under subsection (a)(16).  It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case.  Our decision here does not change that.

*Id.* at 338-39 (some internal quotation marks and citations omitted; footnote omitted).  No relief is due in the instant matter, as it is clear that the trial court considered Mother's role as Child's primary caretaker when conducting its analysis of the Section 5328(a) and 5337(h) factors, in compliance with *M.J.M. See*, *e.g.*, Trial Court Opinion, 2/27/19, at 5 ("Although Mother has been the primary caregiver for [Child], both of the parties are involved with [Child's] education and activities.").

Second, Mother's decision to sign a lease for a residence in Montgomery County prematurely, before securing the trial court's permission to relocate, does not excuse her violation of the August 30, 2018 order.  The suggestion that Mother did not realize she could not relocate until after she had already done so in September 2018 strains credulity, given that she filed a notice of

custody relocation in July 2018, and given that Father filed a counter-affidavit opposing her relocation later that same month. Moreover, Mother's argument ignores the fact that the court entered a prior order on August 9, 2018, well before Mother signed her lease on August 19, 2018, which also prohibited her relocation. The order included the following provision:

### 8. NOTICE: CHANGE OF RESIDENCE OR RELOCATION

Before a party may relocate the child or change the residence of the child in a manner which significantly impairs the ability of other individuals with custody rights to the child to exercise those rights, the party must comply with the requirements and obligations of Pennsylvania's Custody Law set forth in 23 Pa. C.S.A. [§] 5337.[11]

Order and Recommendation, 8/9/18, at 9 (underlining omitted). Accordingly, even if Mother signed her lease prior to the trial court's entry of the August 30, 2018 order, it was within the court's discretion to weigh her improper relocation against her.

Mother argues in her third claim that the trial court erred by finding that her relocation would alter the feasibility of preserving the relationship between

---

[11] Section 5337(b) prohibited Mother from relocating without Father's consent or the trial court's approval:

**(b) General rule.**--No relocation shall occur unless:

(1) every individual who has custody rights to the child consents to the proposed relocation; or

(2) the court approves the proposed relocation.

23 Pa.C.S.A. § 5337(b).

Father and Child. Mother's brief at 21-23. Mother contends that Father would maintain the same amount of custodial time and the same telephone access to Child that he had before the relocation. *Id.* at 22. She concedes that she discontinued allowing Father to use FaceTime with Child, but insists that her decision was justifiable because Father used FaceTime "to question . . . Child as to Mother's whereabouts and generally pry into Mother's life." *Id.* Mother characterizes Father as disinterested and uninvolved in Child's life, and she repeats her previous argument that he is able to commute seventy-eight miles to work each day. *Id.* at 22-23.

The record supports the trial court's determination that allowing Mother to relocate to Montgomery County would impair Father's ability to exercise his custodial rights significantly. It was within the court's discretion, however, to reject Mother's explanation. *V.B.*, 55 A.3d at 1197. Mother's third claim fails.[12]

Finally, Mother's fourth claim is that the trial court erred by finding that she failed to prove her relocation would be in Child's best interest. Mother's

---

[12] It is important to note that credibility determinations are for the trial court and that the trial court did not find Mother credible. As detailed earlier, Mother spent a significant portion of her direct examination accusing Father of domestic violence and declining to accept any blame herself, only to admit on cross-examination that she instigated two of the incidents by kicking down the door to Father's apartment and by smashing through a glass door with a hammer. N.T., 9/26/18, at 88, 91. Mother even admitted that she lied about the source of her injuries to medical staff at the hospital, saying that Father injured her, when in reality her injuries were self-sustained. *Id.* at 92-94.

brief at 23-26. Mother stresses that she secured employment in Montgomery County with a substantial pay increase. *Id.* at 23-25. She also contends that leaving Monroe County will allow her to escape "the emotionally draining and toxic environment of Mother's former home . . . . where she was constantly put down and where her actions were continually questioned by her own mother." *Id.* at 24-25. She repeats her prior argument that she signed the lease for her new residence in Montgomery County before the Court issued its August 30, 2018 order forbidding her from leaving Monroe County. *Id.* at 25.

We conclude once again that Mother is not entitled to relief. As we have stated throughout this memorandum, it is within the discretion of the trial court to make credibility determinations and to weigh the evidence before it. *V.B.*, 55 A.3d at 1197. In this case, the record confirms that Mother's new job appears to have played little if any role in motivating her to leave Monroe County. When asked why she decided to relocate, Mother did not initially mention her new job at all. N.T., 9/26/18, at 18-19. Mother testified that she did not obtain her new job until well after the relocation. *Id.* at 23-25. In fact, she did not even accept the job until the first day of the hearing, on September 26, 2018. *Id.* at 25. Concerning Mother's claim that her relocation will allow her to escape the allegedly "toxic" environment of living with her parents, it is not clear why Mother could not simply find a new place to live in Monroe County. Mother did not testify that she made any effort to find a new job or to obtain her own residence anywhere local.

Ultimately, it appears clear from the record that the primary reason for Mother's relocation to Montgomery County was that she wanted to live with B.V., who had obtained a job in that area. At the time of the hearing, Mother and B.V. had been in a relationship for only six months. *Id.* at 136. Therefore, it was far from certain that their relationship would last or that allowing Mother to relocate to Montgomery County in order to facilitate that relationship would be in Child's best interests. It was reasonable for the trial court to conclude that whatever benefit Child might receive from moving to Montgomery County would pale in comparison to the costs, namely the strain that such a relocation would place on Child's relationship with Father and with her extended family, all of whom reside in Monroe County.

Based on the foregoing, we conclude that the trial court did not abuse its discretion by denying Mother's request to relocate to Montgomery County, awarding both parties shared legal custody, awarding Mother primary physical custody contingent upon her return to Monroe County, and denying Father's petition for contempt. Thus, we affirm the trial court's February 27, 2019 order in all respects subject to the following. Mother shall have 60 days from the filed date of this memorandum to return to Monroe County in order to retain primary custody of Child. Additionally, the stay entered by this Court on August 26, 2019, is hereby vacated. The trial court and parties shall proceed consistent with the foregoing memorandum.

Order affirmed.

President Judge Emeritus Gantman joins the memorandum.

President Judge Emeritus Stevens files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/1/19